# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Marcus Wright, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2020-001265

---

## ON WRIT OF CERTIORARI

---

Appeal From Horry County
William H. Seals, Jr., Circuit Court Judge

---

Opinion No. 6119
Heard June 6, 2024 – Filed July 23, 2025

---

### AFFIRMED

---

J. Falkner Wilkes, of Oakland, Mississippi, for Petitioner.

Senior Assistant Attorney General Mark Reynolds
Farthing, of Columbia, for Respondent.

---

**TURNER, J.:** Marcus Dwain Wright (Petitioner) appeals the denial of his application for post-conviction relief (PCR). He argues the PCR court erred by not finding trial counsel[1] ineffective for failing to immediately inform the trial court he

---

[1] Petitioner was represented by two attorneys at trial, Morgan L. Martin and Edward M. Brown. We will refer to them generally as counsel.

had changed his mind about testifying and failing to move to reopen the record. He contends counsel was deficient and he did not need to prove prejudice because this was a structural error pursuant to *State v. Rivera*, 402 S.C. 225, 741 S.E.2d 694 (2013). We affirm.

**FACTS/PROCEDURAL HISTORY**

Petitioner was indicted for murder in the shooting death of Jerome Green, Jr. (Victim) at the home of Roy James Sinclair on April 30, 2012.

At trial, after the State rested, the trial court began discussing Petitioner's right to testify in his defense. When the trial court asked if Petitioner had any questions about his rights, Petitioner replied, "Not exactly." The trial court clarified, and Petitioner responded that he understood his rights. The trial court then explained,

> Now, this is your decision, to testify or not. You can obtain such advice as you wish from your attorney or from others. Of course, it's not the State's, it's not mine, and it's really not your attorneys'. It's your decision, [Petitioner], and it's up to you to determine whether you wish to testify or not.
>
> And I ask you now -- you're not bound at this point, but have you determined whether you wish to testify or exercise your right to remain silent?

Petitioner responded that he wished to "[e]xercise [his] right to remain to silent."

Trial counsel then proffered the testimony of Christopher McCray. Petitioner sought to introduce McCray's testimony regarding a purported inconsistent statement by one of the State's witnesses about seeing a gun near Victim following the shooting. Following McCray's proffer, the trial court determined the testimony was not admissible because it was hearsay and no exception applied. Trial counsel then stated the defense had no additional witnesses; the jury returned to the courtroom, and the defense rested on the record.

After the trial court dismissed the jury, the parties and the court proceeded with the charge conference. The trial court stated:

I'm going to let you both research this tonight some more, has to do with the voluntary manslaughter and self-defense request. We can talk about it some more today, but I'm going to give each of you the opportunity to do some further research.

And I have asked the [c]ourt [r]eporter to isolate what I recall being the only testimony that -- or I guess it's the testimony based on what has been said earlier upon which the [d]efense relies to support both of those charges, and that is a comment by a self-serving, of course, comment by [Petitioner] as he fled.

My recollection is that the comment was something to the effect is the n****r tried to pull a jack. I don't know that that means anything to anybody outside of whatever community those are intelligible phrases, so with that being if that's the only thing, then I don't know that that's substantial enough to support either of those charges. If there's other -- if there's more stuff, I'll look at it, but my recollection is, of course, the testimony of -- I can't remember her name now, but the driver of the car was that he said, brother, go pick up some shells, and that's certainly of no help to the [d]efense, but -- and I stand to be corrected, but I've asked the [c]ourt [r]eporter to try to find that.
. . . .

**THE COURT:** If the [d]efense think there's some other comments ---

**COUNSEL:** Yeah, Judge, I can. Lanard Powell testified that . . . [Petitioner] said he tried a jack move, a jack move, which in their world is pull a gun and rob him.


**THE COURT:** Well, we don't know -- I think jack means something like hijack, and that doesn't necessarily mean a gun was pulled.
. . . .

**COUNSEL:** In addition to that, it is my recollection that . . . Powell testified that in some other conversations that [Petitioner] said that he thought he was pulling a gun, because the question was asked, well, did he say he ever saw a gun, to which the answer was no, but it's clear that . . . Powell testified that [Petitioner] told him that he came in, made those comments about who's up -- and you're letting these boys up in your place, and was moving around, and that he reached for something. That's in there.

You've got Mildred Small who testified to the effect that . . . the [V]ictim in the case reached for something, and you've got Veronica Chandler who testified. Now, I've got to go back and look at her statement so I can tell you exactly what she did testify to. Now, she denied that she said some- -- one thing that I asked her, but she admitted that she said the other that I asked her, which was that she thought something, and I can get the exact testimony, or the [c]ourt [r]eporter can, but something to the effect that he reached or went for something.

And I think, you know, all of that independent or cumulatively, under the standard that we have, and that is the evidence must be viewed in the light most favorable to [Petitioner] and if there's any evidence whatsoever, then the Court should charge manslaughter as well.

Of course, you know the law better than I do, but I think that there [are] other references in there that would get us to that, including the conversation . . . about him coming in and say, hey, you got these boys up in your place, and doing it in a confrontive or combative manner, so I know I those things there. I can think about more overnight, ---

**THE COURT:** Well, words alone wouldn't be sufficient, but ask the [c]ourt [r]eporter . . . .
 . . . .

**COURT REPORTER:** It's something to the effect, you've got these young boys in your house now, and [Victim] looks as if he's going for a gun, took three steps and he's reaching by his abdomen.

. . . .

**COURT REPORTER:** Your question was, did he say [Victim] threatened him in any way? And his answer was no.

**THE COURT:** So he asked if he was threatened in any way, and he said no?

**THE STATE:** That's correct.

**THE COURT:** Well, that's interesting because -- so that one case we've been looking at, *State [v.] Starnes*, . . . talks about whether or not the person seeking voluntary manslaughter -- in this one, the State agreed that self-defense was applicable, but it talks about there having to be fear, and if he wasn't afraid, under *Starnes* it does not look like he would, be entitled to voluntary manslaughter. And under the general self-defense, he's got to be in reasonable fear of imminent harm, imminent danger. He must be either actually -- was actually in imminent danger of death or bodily injury or believed he was, and if he testified he was not, then that might end the inquiry, ---

**COUNSEL:** Well, Judge, I don't believe it's that simple. [Petitioner] didn't testify to that. [Powell] -- there was a testimony that he said that's what he answered in the question, but that is not definitive on the issue because you've got his other statements, which she also read into the record, which was, again, I believe, paraphrasing, that he came in, that he had that conversation, that he reached for something.

Now, for -- you can't take that away just simply because this co-defendant testifying to the State, said, I well, did

he say he was afraid of him?  No.  The reverse of that is, well, do you know whether, he was afraid of him or not?  The fact he didn't say it doesn't mean he wasn't afraid of him . . . .  [B]ut it's clear . . . in my opinion that there is several witnesses who testified about [Petitioner] coming in and reaching or making a move for something, and I think that there has to be an implication from that that if the response to that is to pull a gun and to shoot, that there was circumstantial evidence, which is good evidence, of fear, even to the extent that it raise -- rise to the level of self-defense.

So I'll look at these cases tonight, as you've asked, and be willing to look at it, but I do -- did want to make the point I don't think it's definitive of anything, the answer he said, Well, did he tell you he was afraid?  And the answer was no.  That doesn't mean he wasn't afraid.  It just said he didn't say that to me.

**THE COURT:** He said no.

. . . .

**COUNSEL:** If [Petitioner] had have said -- if you asked him were you afraid, and he said no, then you're right.  That would end the inquiry, but for Powell to say he didn't tell me he was afraid doesn't end the inquiry in my mind at least.

**THE COURT:** All right.  Let me listen to the question and answer again.

**THE REPORTER:** The question by the [State] was did he say [Victim] threatened him in any way?  And the answer was no.

**COUNSEL:** Well, and that goes to my point, because that don't mean he didn't.  Now, that's -- matter of fact, that's inconsistent with the other statements that he said [Petitioner] made to him.

>**THE COURT:** All right. Well, we'll take a look at it overnight.

When the proceedings reconvened the next morning, the trial court heard arguments from both sides. It then ruled that it would not give either charge because no evidence was presented of the crucial element of any fear of imminent danger by Petitioner at the time the shots were fired.

Petitioner then personally tried to speak to the trial court. Trial counsel informed the court Petitioner had told him that morning he had changed his mind and wanted to testify. Trial counsel stated he had informed Petitioner "that in [his] opinion that matter has passed us by as based on his assertion to the [c]ourt that he wished to remain silent. We have rested, but out of an abundance of precaution for the record, I don't want to cut him off, and I'll tell the [c]ourt that is what he wants to address with the [c]ourt." The trial court stated:

>No. The record is closed. We're at this stage of the trial. He had his opportunity. Now that he has seen how the [c]ourt has ruled, he wants to adjust his strategy, I guess. I don't know what he wants to do, quite frankly, but it would appear that the desire now to testify is the result of rulings by the [c]ourt.
>
>He's had his chance, and I explained his rights to him, and [c]ounsel indicated they did, so I -- I deny any motion to re-open the record for any testimony by [Petitioner].

Counsel pointed out that the trial court had told Petitioner the previous day that he was not bound by his decision, and the trial court agreed. The trial court admitted it "did not emphasize" that Petitioner had to decide during the trial whether to testify; however, the trial court thought "any reasonable person would believe the right to testify was extinguished after the defense rest[ed]." Counsel stated "this is a thought that [Petitioner] has had overnight apparently." The trial court again stated that Petitioner would not be allowed to testify because the record was closed. The trial court asked counsel why he had not brought Petitioner's change in wanting to testify to the court's attention before the trial court ruled on the jury charges. The trial court stated:

>I just ruled on the two, voluntary manslaughter and self-defense, just a few minutes ago, and he did not, when he

came in here, neither he, nor you, nor [co-counsel] made
any . . . overture to the [c]ourt that he wanted to change
his mind and testify.  That would have been the time,
before the [c]ourt ruled.

What he did, waited till I ruled, found out he wasn't
going to have the benefit of these two defenses, and then
he decided, well, maybe I better take the stand and tell
them I was afraid to death, now that he knows what the
[j]udge says is missing and now that he's got it all
mapped out, and he can come up and just make whatever
-- and fit his testimony into the parameters required.
That ain't going to happen.

Counsel then attempted to clarify that Petitioner raised his change of heart to
counsel before the ruling, but counsel advised him "that time had passed him by,
that we had rested based on his assertion that he didn't want to testify[,]" and
counsel "didn't bring it up before we got into the motion."  The trial court stated,
"[I]t wasn't called to the [c]ourt's attention until that point . . . .  So I'm not going to
allow him to testify.  The record is closed."

The jury convicted Petitioner of murder, trafficking in cocaine, possession with
intent to distribute cocaine base, and possession of a weapon during the
commission of a violent crime.  The trial court sentenced him to life imprisonment
for murder and concurrent sentences of five years' imprisonment for possession of
a weapon, twenty-five years' imprisonment for trafficking in cocaine, and fifteen
years' imprisonment for possession with intent to distribute, to be served
consecutively to the murder sentence.

Petitioner appealed his conviction and sentence.  On direct appeal, Petitioner
"argue[d] the trial court erred in denying his request to testify, which he made after
the defense had rested and the trial court had ruled it would not charge the jury on
voluntary manslaughter or self-defense." *State v. Wright*, 416 S.C. 353, 371, 785
S.E.2d 479, 489 (Ct. App. 2016).  This court found that "[a]lthough [Petitioner]
asserts on appeal that his counsel erred in failing to timely inform the trial court
that he wished to testify—which would be an ineffective assistance of counsel
claim—he also asserts the trial court erred in denying his request to testify after the
defense rested—which would be a claim of constitutional error." *Id.* at 373, 785
S.E.2d at 490.  This court determined Petitioner was "ultimately asserting the trial
court deprived him of his right to testify by refusing to reopen the record and allow
him to testify after the defense rested." *Id.* at 373-74, 785 S.E.2d at 490.

This court affirmed and held:

> [T]he trial court did not abuse its discretion in refusing to reopen the record to allow [Petitioner] to testify after the defense had rested and the trial court had ruled it would not charge the jury on voluntary manslaughter and self-defense. The trial court was concerned that if it permitted [Petitioner] to testify after hearing its ruling on the voluntary manslaughter and self-defense jury charges and learning which supporting evidence the trial court said was missing, [Petitioner] would be able to fit his testimony into the required parameters for those charges by testifying that he shot the Victim because he feared for his life. This was a legitimate ground for refusing to reopen the record, and the trial court's restriction of [Petitioner's] right to testify was not arbitrary.

*Id.* at 374, 785 S.E.2d at 490.

Petitioner then filed a PCR application. The PCR court held an evidentiary hearing and ultimately denied and dismissed Petitioner's application with prejudice. Petitioner filed a Rule 59(e), SCRCP, motion to alter or amend, which the PCR court partially granted. It issued an amended order, which again denied and dismissed Wright's application with prejudice. This appeal followed.

## ISSUE ON APPEAL

Is the PCR court's decision denying relief contrary to the Fifth Amendment and in direct conflict with the analysis and holding in *State v. Rivera*, 402 S.C. 225, 247, 741 S.E.2d 694, 706 (2013)?

## LAW/ANALYSIS

"A criminal defendant is guaranteed the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution." *Taylor v. State*, 404 S.C. 350, 359, 745 S.E.2d 97, 101 (2013). To establish a claim of ineffective assistance of counsel, a PCR applicant must show (1) counsel was deficient and (2) counsel's deficiency prejudiced the defendant's case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Failure to make the required showing of either

deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700.

"The prejudice showing is in most cases a necessary part of a *Strickland* claim." *Weaver v. Massachusetts*, 582 U.S. 286, 300 (2017). Generally, a petitioner "must demonstrate either that the error at issue was prejudicial or that it belongs to the narrow class of attorney errors that are tantamount to a denial of counsel, for which an individualized showing of prejudice is unnecessary." *Id.* at 308 (Alito, J., concurring in judgment). "In the ordinary *Strickland* case, prejudice means 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "In post-conviction proceedings, the burden of proof is on the [petitioner] to prove the allegations in his application." *Speaks v. State*, 377 S.C. 396, 399, 660 S.E.2d 512, 514 (2008).

## A. Deficiency

Petitioner contends the PCR court erred in finding counsel was not ineffective for failing to immediately inform the trial court he wished to testify and moving to reopen the record. He argues counsel did not recognize the fundamental nature of a defendant's right to testify and counsel's failure to act created a structural error. However, even if counsel's conduct was deficient, we do not agree that the deficiency caused a structural error.

First, we acknowledge *Rivera*'s holding that a *trial court's improper refusal* to permit a defendant to testify is a structural error. 402 S.C. at 247, 741 S.E.2d at 706. In *Rivera*, the defendant clearly communicated his desire to testify to both the court and trial counsel during his presentation of evidence, but his counsel "actively thwarted" his vehement and consistent requests. *Id.* at 243, 741 S.E.2d at 703. Our South Carolina supreme court noted that Rivera "unambiguously indicated to the trial court that he wished to take the stand and vociferously objected to the trial court's decision not to permit him to testify." *Id.* The trial court's decision not to allow Rivera to testify was based on its erroneous determination that Rivera's testimony was prejudicial to his own case and irrelevant under Rule 403, SCRCP; as our supreme court noted, the trial court was motivated by "a paternalistic desire to protect [Rivera] from himself." *Id.* at 244-45, 741 S.E.2d at 704.

However, the *Rivera* court acknowledged that "the right to present testimony is not without limitation." *Id.* at 242, 741 S.E.2d at 703. In a footnote, the court clarified

that its "findings should not be taken as a restriction of the trial court's ability to constrain a defendant's testimony based on a *proper* application of the evidentiary rules." *Id.* at 246 n.3, 741 S.E.2d at 705 n.3. Thus, *Rivera* recognizes that there are situations in which a trial court may properly deny a defendant the right to testify, without causing a structural error. We find Petitioner's case is an example of this principle.

Here, Petitioner initially informed the trial court that he did not want to testify. Petitioner changed his mind overnight, after the defense rested and the parties and the court had begun discussing jury charges, but the trial court refused his request to testify. Notably, Petitioner raised this issue on direct appeal, and after considering *Rivera*, our court held that the denial of the right to testify in this case was not erroneous because "[t]he trial court was concerned that if it permitted [Petitioner] to testify after hearing its ruling on the voluntary manslaughter and self-defense jury charges and learning what supporting evidence the trial court said was missing, [Petitioner] would be able to fit his testimony into the required parameters for those charges." *Wright*, 416 S.C. at 374, 785 S.E.2d at 490. Accordingly, this court found the trial court had "a legitimate ground for refusing to reopen the record" to permit Petitioner to testify and the trial court's denial of Petitioner's request to testify was not improper. *Id.* Therefore, in contrast to *Rivera*, there was no structural error in this case because only the *erroneous* deprivation of the right to testify results in a structural error.

We understand Petitioner's contention now is slightly different—that if counsel had moved to reopen the record earlier, the trial court would have allowed the testimony. Indeed, the trial court itself appeared to consider that possibility in denying Petitioner's request to testify. However, we note that the standard here is whether counsel's "representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). Moreover, courts "considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). In the exchange with the trial court, counsel stated he had informed Petitioner "that in [his] opinion that matter has passed us by as based on his assertion to the [c]ourt that he wished to remain silent." We cannot say that no reasonable attorney would have made that same calculation. Accordingly, we find counsel was not deficient.

Normally, our finding that counsel was not deficient would end our inquiry. *See Strickland*, 466 U.S. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."). However, because Petitioner contends the PCR court erred in applying the *Strickland* standard to this issue and in response to the well-reasoned dissent, we address the question of prejudice.

## B. Prejudice

Petitioner maintains the PCR court not only erred in failing to find counsel deficient, but it also erroneously conducted a prejudice analysis under the second prong of *Strickland*. He asserts that in doing so, the PCR court applied a harmless-error analysis to the denial of Petitioner's right to testify, contrary to *Rivera*. We find that even if counsel's alleged deficiency led to a structural error, it was not one that always renders a trial fundamentally unfair; therefore, we hold Petitioner was still required to prove prejudice pursuant to *Weaver*. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006) ("Counsel cannot be 'ineffective' unless his mistakes have harmed the defense (or, at least, unless it is reasonably likely that they have)."); *id.* ("Thus, a violation of the Sixth Amendment right to *effective* representation is not 'complete' until the defendant is prejudiced."); *see also Hartsfield v. Dorethy*, 949 F.3d 307, 314 (7th Cir. 2020) ("The Supreme Court's recent precedents are not to the contrary; in fact, they too draw a distinction between *a court's* denial of a defendant's constitutional right and *counsel's* denial of that same right." (emphasis added)).

Generally, "constitutional error does not automatically require reversal of a conviction." *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991). However, structural errors are those constitutional errors that "should not be deemed harmless beyond a reasonable doubt." *Weaver*, 582 U.S. at 294. "[T]he defining feature of a structural error is that it 'affects the framework within which the trial proceeds' rather than being 'simply an error in the trial process itself.'" *Id.* at 295 (quoting *Fulminante*, 499 U.S. at 310) (alterations omitted)). "For the same reason, a structural error 'defies analysis by harmless error standards.'" *Id.* (quoting *Fulminante*, 499 U.S. at 309 (alterations omitted)).

Initially, we acknowledge *Rivera*'s holding that "*a trial court's* improper refusal to permit a defendant to testify in his own defense . . . is not amenable to harmless-error analysis" and "requires reversal without a particularized prejudice inquiry." 402 S.C. at 247, 741 S.E.2d at 706 (emphasis added). Importantly, this holding is not in conflict with *Weaver*, which reinforced existing jurisprudence

holding that "in the case of a structural error where there is an objection at trial and the issue is raised on *direct appeal*, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" 582 U.S. at 299 (emphasis added). However, *Weaver* examined a slightly different question: "whether invalidation of the conviction is required . . . or if the prejudice inquiry is altered when the structural error is raised in the context of an ineffective assistance of counsel claim." *Id.* at 290. The Supreme Court concluded that there is indeed a different calculus when a structural-error claim is preserved and raised on direct review as opposed to when it is raised in the context of ineffective assistance of counsel.[2] *Id.* at 302.

---

[2] We acknowledge that *Weaver* states its holding is limited to "the context of trial counsel's failure to object to the closure of the courtroom during jury selection," and not to all structural errors. *Id.* at 294. However, multiple federal and state courts have since interpreted and applied *Weaver*'s framework in other structural error contexts, as we do here. *See, e.g., Parks v. Chapman*, 815 F. App'x 937, 944 (6th Cir. 2020) (applying *Weaver* in the context of "a violation of the fair-cross-section right" and finding it "stands for the idea that finality and judicial economy can trump even structural error; so, when a defendant raises a structural error on collateral review rather than on direct review, he must prove actual prejudice, even though he would not have had to prove actual prejudice if he had raised it on direct review"); *Hartsfield*, 949 F.3d at 314-15 ("In our view, the best reading of the Supreme Court's decisions in this realm is that *Strickland* controls because defense counsel allegedly interfered with Hartsfield's right to testify. Accordingly, the state appellate court's decision to apply *Strickland* was not contrary to clearly established federal law."); *Baxter v. Superintendent Coal Twp. SCI*, 998 F.3d 542, 547 (3d Cir. 2021) (applying *Weaver* and holding "[a] showing of structural error, however, does not always trigger a presumption of prejudice"); *Yannai v. United States*, 346 F. Supp. 3d 336, 346-47 (E.D. N.Y. 2018) ("A defendant's right to testify falls within the first of these three [*Weaver*] categories . . . . Thus, even though Yannai's right to testify at his trial is a fundamental right and any denial of that right may have been 'structural error,' he is still required to show prejudice here."); *Carter v. Clarke*, 667 F. Supp. 3d 163, 199 (W.D. Va. 2023) ("*Weaver* forecloses Carter's argument that the denial of his right to testify was structural error and not subject to a prejudice analysis."), *appeal dismissed*, No. 23-6382, 2023 WL 7128469 (4th Cir. June 9, 2023); *Cabrera v. State*, 173 A.3d 1012, 1022-23 (Del. 2017) (applying *Weaver* and holding the defendant's ineffective assistance of counsel claim based on a *Batson* violation—a structural error—"was properly dismissed for failure to show prejudice"); *Newton v. State*, 168 A.3d 1, 10 (Md. 2017) (applying *Weaver* to a defendant's claim that

"The prejudice showing is in most cases a necessary part of a *Strickland* claim." *Id.* at 300. "In the ordinary *Strickland* case, prejudice means 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). The reason for placing the burden on the petitioner, rather than the State, in postconviction proceedings is, in part, because "when state or federal courts adjudicate errors objected to during trial and then raised on direct review, the systemic costs of remedying the error are diminished to some extent." *Id.* at 302. For example, "if a new trial is ordered on direct review, there may be a reasonable chance that not too much time will have elapsed for witness memories still to be accurate and physical evidence not to be lost." *Id.* However, "[w]hen an ineffective-assistance-of-counsel claim is raised in postconviction proceedings, the costs and uncertainties of a new trial are greater because more time will have elapsed in most cases." *Id.* Additionally, "[t]he finality interest is more at risk[,] . . .and direct review often has given at least one opportunity for an appellate review of trial proceedings." *Id.* at 302-03 (internal citations omitted). These important differences between direct appellate review and collateral review "justify a different standard for evaluating a structural error depending on whether it is raised on direct review or raised instead in a claim alleging ineffective assistance of counsel." *Id.* at 303.

"[T]he rules governing ineffective-assistance claims 'must be applied with scrupulous care.'" *Id.* (quoting *Premo v. Moore*, 562 U.S. 115, 122 (2011)). Accordingly, in an ineffective-assistance claim, even when a defendant raises a structural error, "the defendant generally bears the burden to show deficient performance and that the attorney's error 'prejudiced the defense.'" *Id.* at 287 (quoting *Strickland*, 466 U.S. at 687); *see also id.* at 309 (Alito, J., concurring) ("Weaver's theory conflicts with *Strickland* because it implies that an attorney's error can be prejudicial even if it 'had no effect,' or only 'some conceivable effect,' on the outcome of his trial. That is precisely what *Strickland* rules out." (citations omitted)).

*Weaver* further explains that structural errors fall into one of three categories based on the rationale underlying their classification as structural: whether (1) "the right at issue is not designed to protect the defendant from erroneous conviction but

---

trial counsel was ineffective for failing to object to the presence of an alternate juror during deliberations and concluding "that to succeed on his ineffective-assistance-of-counsel claim, [the defendant] must establish *Strickland*'s deficient performance and prejudice prongs").

instead protects some other interest," (2) "the effects of the error are simply too hard to measure," or (3) "the error always results in fundamental unfairness." *Id.* at 295-96. These categories "are not rigid" and "more than one of these rationales may be part of the explanation for why an error is deemed to be structural." *Id.* at 296. However, "one point is critical: An error can count as structural even if the error does not lead to fundamental unfairness in every case." *Id.* The crucial determination for this court is whether the particular structural error at issue here "counts as structural because it *always* leads to fundamental unfairness or for some other reason." *Id.* at 296 (emphasis added). We find that it does not.

First, the right to testify in one's defense "is not designed to protect the defendant from erroneous conviction" but rather is "based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Id.* at 295; *see also Mccoy v. Louisiana*, 584 U.S. 414, 427-28 (2018) (finding "counsel's admission of a client's guilt over the client's express objection" was a structural error falling under the first and second *Weaver* categories because it impacted "the defendant's right to make the fundamental choices about his own defense"); *Yannai*, 346 F. Supp. 3d at 346 ("[T]he right to testify falls within the first category of structural rights laid out in *Weaver* because it 'is not designed to protect the defendant from erroneous conviction but instead protects some other interest,'—namely, the defendant's right to choose how best to protect his liberty." (quoting *Weaver*, 582 U.S. at 295)); *Boyd v. United States*, 586 A.2d 670, 673 (D.C. Ct. App.1991) ("Although a defendant who chooses to testify may actually decrease his or her chance of acquittal, nonetheless, 'the wisdom or unwisdom of the defendant's choice does not diminish his right to make it.'" (quoting *People v. Curtis*, 681 P.2d 504, 513 (Colo. 1984))); *Rock v. Arkansas*, 483 U.S. 44, 52 (1987) (stating "an accused's right to present his own version of events in his own words" is "fundamental to a *personal* defense" (emphasis added)). Thus, the improper denial of a defendant's right to testify falls under the first *Weaver* category. *See* 582 U.S. at 295 (explaining the first category encompasses structural errors involving rights that are "not designed to protect the defendant from erroneous conviction but instead protect[] some other interest").

Additionally, as noted in *Rivera*, the denial of a defendant's right to testify in the direct-appeal context rises to the level of a structural error, in part, because of the difficulty in measuring the effects of the error. 402 S.C. at 247-48, 741 S.E.2d at 706-07. This rationale implicates the second *Weaver* category. *See* 582 U.S. at 295 (stating structural errors fall into the second category when "the effects of the error are simply too hard to measure"). *Rivera*, for example, relied on *Luce v. United States*, which states that ascertaining prejudice requires "the court [to] know

the precise nature of the defendant's testimony, which is unknowable when . . . the defendant does not testify."  402 S.C. at 248, 741 S.E.2d at 706 (quoting *Luce*, 469 U.S. 38, 41-42 (1984)).  We note that this concern—that a court cannot fairly evaluate prejudice without knowing the precise nature of the defendant's testimony—is eliminated in PCR where, unlike in a direct appeal, the court has the benefit of hearing the defendant's testimony, further supporting the argument that Petitioner must establish prejudice in the ineffective-assistance context.

Further, *Rivera* itself acknowledged that "the right to present testimony is not without limitation," and "'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'"  *Id.* at 242, 741 S.E.2d at 703 (quoting *Rock*, 483 U.S. at 55).  Similarly, in *Weaver*, the Supreme Court stated that "[t]he fact that the [structural error at issue] is subject to . . . exceptions suggests that not every . . . violation results in fundamental unfairness."[3]  583 U.S. at 298.  This suggests that the erroneous denial of the right to testify would fall into the first and/or second *Weaver* categories, not the third.  *See* 582 U.S. at 296 (explaining the third category of structural errors encompasses those that "always result[] in fundamental unfairness").

Finally, we are also concerned that finding, as the dissent does, that a violation of the right to testify *always* creates fundamental unfairness such that prejudice must be presumed is a misreading of *Rivera* that would lead to its unintentional

---

[3] Throughout our discussion, we use the terms "fundamental right" and "fundamental unfairness."  However, we note that the meaning of "fundamental" varies depending on the context.  A structural error results in "fundamental unfairness" because "[s]uch errors 'infect the entire trial process'" such that the trial becomes an "unreliable vehicle for determining guilt or innocence."  *Neder v. United States*, 527 U.S. 1, 8-9 (1999) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993)).  On the other hand, the right to testify is a "fundamental" right in that it is a personal right only the defendant can decide to exercise (or not).  *See, e.g.*, *Johnson v. State*, 169 S.W.3d 223, 236 (Tex. Crim. App. 2005) ("The footnote in *Rock* in which the Supreme Court labeled the right to testify as 'fundamental' suggested that the right was fundamental in the sense that the defendant possessed the ultimate authority to decide whether to invoke it."); *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992) (labeling the right to testify as "fundamental" because "[t]his right is personal to the defendant and cannot be waived either by the trial court or by defense counsel").  Therefore, simply because a right is "fundamental" does not equate to an automatic exemption from an evaluation of harm or prejudice.

expansion. As discussed above, *Rivera* is clear that the right to testify is not without limitation. 402 S.C. at 242, 741 S.E.2d at 703. Moreover, the *Rivera* court specifically acknowledged that Rivera's claim was "consistently . . . presented not as an ineffective assistance of counsel claim, but rather, as an error committed by the trial court." *Id.* at 241, 741 S.E.2d at 702. It further noted that such claims may often be presented either as a claim of trial court error or a claim of ineffective assistance of counsel. *Id.* at 240. Thus, we believe *Rivera* itself implicitly acknowledges its holding applies only in the direct appeal context, and it does not compel a finding of prejudice in an ineffective assistance claim. *Id.* at 241.

Accordingly, we find that the denial of the right to testify does not fall within *Weaver*'s third class of structural errors, which always result in fundamental unfairness; rather, we find that the improper denial of a defendant's right to testify falls into the first and second categories. *Weaver* instructs that if the structural error is one that does not fall into the third category then prejudice will not be presumed, and therefore, we hold Petitioner is required to make the traditional *Strickland* prejudice showing.[4] *See* 582 U.S. at 300-01 (holding that because the structural error at issue would not always lead to a "fundamentally unfair trial" nor did it "always deprive[] the defendant of a reasonably probability of a different outcome[,] . . . *Strickland* prejudice is not shown automatically").

With all of these principles in mind, we turn to the analysis of prejudice in Petitioner's case.

### C. Application to Petitioner's case

Petitioner asserts he was prejudiced by counsel's deficient performance; however, he argues that a "particularized analysis of specifics and [the] degree of that prejudice is not necessary under the facts of this case and the holding of" *Rivera*.

---

[4] We note that *Weaver* explicitly declined to rule on whether a petitioner must prove prejudice when the structural error at issue falls in the third category. *See* 582 U.S. at 301-02 (explaining that "[n]either the reasoning nor the holding" in *Weaver* "calls into question the Court's precedents determining that certain errors are deemed structural and require reversals because they cause fundamental unfairness" when raised on direct appeal, but stating the "opinion does not address whether the result should be any different if the errors were raised instead in an ineffective-assistance claim on collateral review"). Therefore, even if the denial of Petitioner's right to testify was a structural error that falls into the third *Weaver* category, the law is far from clear that prejudice should be presumed.

Instead, he asserts "[t]he prejudice lies in the violation of [his] right to testify." We disagree.

At the PCR hearing, Petitioner admitted that he did not change his mind about wanting to testify until the next morning after the defense rested, having thought about his case overnight and concluding that it "wasn't murder." Petitioner asserted that he shot Victim in self-defense, which he claimed was the defense's primary theory of the case. He testified that when Sinclair, the homeowner, let Victim back in the house, Victim stated he was going to "put the squeeze" on someone because Victim was upset about the number of people there. Petitioner explained he interpreted that to mean Victim was going to "squeeze a gun." He testified Victim then pulled a gun and turned towards him; Petitioner then fired until Victim fell to the floor. Petitioner asserted he shot Victim "because [he] was scared" for his life and he was defending himself. However, he acknowledged that he was not interested in cooperating with law enforcement, and importantly, he did not tell the police he shot Victim in self-defense and instead claimed that a "jack move"—i.e. a robbery—had gone wrong.

The PCR court found counsel was not deficient by informing Petitioner that it was too late to change his mind about testifying because the charge conference had begun. The PCR court further found Petitioner's testimony was not credible and noted it would have hurt his case, not helped it, because it confirmed he was the shooter, was not supported by the evidence, was illogical, and he admitted to lying in his interactions with law enforcement afterwards. Finally, the PCR court also noted the trial court had discussed what testimony would support the self-defense charge and was therefore unlikely to have granted Petitioner's motion. The PCR court concluded that even if counsel had immediately informed the trial court of Petitioner's change of heart, there was no reasonable probability the outcome of the proceeding would have been different, and thus, Petitioner had failed to prove prejudice. We agree with the PCR court.

During the initial charge conference, well before Petitioner informed counsel of his change of heart, the trial court explicitly stated it did not believe there was enough evidence to support either a voluntary manslaughter instruction or a self-defense instruction. Further, the trial court repeatedly noted that one of the State's witnesses had testified that Petitioner never told him that Petitioner feared for his life at the time of the shooting. Specifically, the trial court stated, "[U]nder the general self-defense, [Petitioner]'s got to be in reasonable fear of imminent harm, imminent danger. He must be either . . . actually in imminent danger of death or bodily injury or believed he was, and if [the witness] testified [Petitioner] was not,

then that might end the inquiry." Ultimately, because of the long discussion regarding the law and the trial court's candid assessment of the evidence *before* Petitioner ever informed counsel of his desire to testify, we find the trial court likely would not have changed its ruling. *Cf. United States v. Walker*, 772 F.2d 1172, 1881 (5th Cir. 1985) (noting that reopening the record after the defense rests may be proper if "[n]o significant information was brought forth that [the defendant] had not already learned during the government's case-in-chief"). Its stated rationale for denying the motion to reopen—the possibility that Petitioner could tailor his testimony—would have still applied had counsel informed the trial court of Petitioner's change of heart immediately when court reconvened the next morning.

Moreover, even without the deference we give to the PCR court's credibility findings, we agree with the PCR court's assessment of Petitioner's credibility and the likely effect of his testimony on the jury. *See Thompson v. State*, 423 S.C. 235, 247, 814 S.E.2d 487, 493 (2018) (explaining that appellate courts "defer to the PCR court's credibility findings as to witnesses who testified before the PCR court"). First, counsel both testified that self-defense was *not* a main theory of their case, nor was it a primary focus of the defense strategy; thus, we find Petitioner's assertion that he wanted to testify to explain he had shot in self-defense was a new development motivated by the trial court's comments during the charge conference, seriously diminishing his credibility. More importantly, we agree that Petitioner's testimony undermined his defense, rather than bolstered his innocence, as it confirmed his identity as the shooter, was contradicted by other testimony and evidence, and contained admissions that he was dishonest with law enforcement and uninterested in cooperating to resolve the investigation.

Thus, we find Petitioner failed to prove he was prejudiced by counsel's failure to immediately inform the trial court of his newfound desire to testify. We agree with the PCR court that the trial court would not have changed its ruling, and, in any event, a jury was unlikely to find Petitioner's version of events persuasive. Therefore, we hold Petitioner failed to prove he was prejudiced by counsel's delay in moving to reopen the record. *See Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, . . . and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."); *id.* at 695 ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.").

**CONCLUSION**

Based on the foregoing, the decision of the PCR court is

**AFFIRMED**.

**WILLIAMS, C.J., concurs**.

**KONDUROS, J., dissenting:** I respectfully dissent.  Petitioner contends the PCR court erred in finding trial counsel was not ineffective for failing to immediately inform the trial court he wished to testify.  He argues trial counsel, by not making a timely motion to reopen the case, was deficient because trial counsel did not recognize the fundamental nature of a defendant's right to testify.  He further maintains the PCR court, despite having found trial counsel was not deficient, erroneously proceeded to conduct a prejudice analysis under the second prong of *Strickland v. Washington*, 466 U.S. 668 (1984).  He asserts that in doing so, the PCR court applied a harmless-error analysis to the denial of Petitioner's right to testify on his own behalf, contrary to *State v. Rivera*, 402 S.C. 225, 741 S.E.2d 694 (2013).  I agree.

To establish a claim of ineffective assistance of counsel, a PCR applicant must show (1) counsel was deficient and (2) counsel's deficiency prejudiced the defendant's case.  *Strickland*, 466 U.S. at 687.  "The prejudice showing is *in most cases* a necessary part of a *Strickland* claim."  *Weaver v. Massachusetts*, 582 U.S. 286, 300 (2017) (emphasis added).  "[T]he concept of prejudice is defined in different ways depending on the context in which it appears.  In the ordinary *Strickland* case, prejudice means 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Id.* (quoting *Strickland*, 466 U.S. at 694).  However, "the prejudice inquiry is not meant to be applied in a 'mechanical' fashion."  *Id.* (quoting *Strickland*, 466 U.S. at 696).  "[T]he ultimate inquiry must concentrate on 'the fundamental fairness of the proceeding.'"  *Id*. (quoting *Strickland*, 466 U.S. at 696).  "A defendant must demonstrate either that the error at issue was prejudicial or that it belongs to the narrow class of attorney errors that are tantamount to a denial of counsel, for which an individualized showing of prejudice is unnecessary."  *Id.* at 308 (Alito, J., concurring in judgment).

**I.  Deficiency**

To meet the first prong of *Strickland*, a PCR applicant must demonstrate trial "counsel's performance was deficient." 466 U.S. at 687. This requires "show[ing] that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "The Sixth Amendment refers simply to 'counsel,' not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions." *Id.* "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.*; *see also Brown v. State*, 340 S.C. 590, 593, 533 S.E.2d 308, 309 (2000) ("[A]n applicant . . . must show . . . his counsel failed to render reasonably effective assistance under prevailing professional norms . . . .").

"Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant . . . ." *Strickland*, 466 U.S. at 688. "From counsel's function as assistant to the defendant derive[s] the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id.* "Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* "The purpose [of the effective assistance guarantee] is simply to ensure that criminal defendants receive a fair trial." *Id.* at 689.

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.*; *see also Ard v. Catoe*, 372 S.C. 318, 331, 642 S.E.2d 590, 597 (2007) ("When evaluating the reasonableness of counsel's conduct, 'the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.'" (quoting *Strickland*, 466 U.S. at 690)).

In *Stone v. State*, our supreme court analyzed whether trial counsel was deficient when it failed to object to several pieces of testimony made during the victim

impact stage of a sentencing proceeding, noting that the admission or exclusion of that testimony was within the trial court's discretion. 419 S.C. 370, 380-90, 798 S.E.2d 561, 566-72 (2017). While the alleged deficiency here was not due to trial counsel's failure to object, both *Stone* and the present case involve a failure by trial counsel to raise an issue to the trial court, which the trial court had the discretion to decide. In *Stone*, the supreme court examined each piece of testimony with which the petitioner took issue but explained it did "not intend with this discussion to define which of the [pieces] would have been permissible for the trial court to admit within its discretion. Rather, [the supreme court explained it would] discuss them to demonstrate that, with varying degree, the admission of each one was debatable." *Id.* at 386, 798 S.E.2d at 569-70. The supreme court provided, "Without an objection, however, there can be no debate[,] and the trial court has no opportunity to exercise its discretion." *Id.* at 386, 798 S.E.2d at 570. The supreme court stated, "[E]ven if the trial court was being 'liberal' in allowing . . . testimony, trial counsel should have objected to those components of the . . . testimony as to which counsel felt he had a reasonably persuasive argument for exclusion." *Id.* The supreme court explained, "If [trial counsel] had objected in those instances, the trial court may have sustained the objection. But in any event, counsel would have at least tested the trial court's discretion." *Id.* The supreme court noted, "The fact the trial court has such wide discretion does not justify the decision not to object. Rather, the debate that precedes the exercise of that discretion is part of the adversarial process *Ard* and *Strickland* require trial counsel to test." *Id.* The supreme court found, "Trial counsel failed to articulate any valid strategic reason for not objecting to important . . . testimony the trial court had the discretion to exclude." *Id.* at 387, 798 S.E.2d at 570. Accordingly, the supreme court determined "the decision not to object d[id] not meet an objective standard of reasonableness, and [the PCR applicant] . . . satisfied the first prong of *Strickland*." *Id.*

In this case, Petitioner argues trial counsel acted deficiently by not moving to reopen the record to allow Petitioner to testify at the first opportunity after Petitioner had informed trial counsel he wanted to testify. "'A motion to reopen the evidentiary record and to allow additional evidence is addressed to the sound discretion of the trial [court,]' and the trial court's 'ruling will not be reversed absent an abuse of discretion.'" *State v. Wright*, 416 S.C. 353, 371, 785 S.E.2d 479, 489 (Ct. App. 2016) (alteration in original) (quoting *State v. Wren*, 322 S.C. 103, 105, 470 S.E.2d 111, 112 (Ct. App. 1996)). "[L]iberality is the linchpin of" a determination of whether to reopen the case because "[a] trial is a search for the truth." *Wren*, 322 S.C. at 105, 470 S.E.2d at 112. The trial court has the discretion "to grant or refuse an application for the reopening of a case and the introduction of

additional evidence by a litigant who has rested, even after the commencement of arguments to the jury and later." *Daniel v. Tower Trucking Co.*, 205 S.C. 333, 351-52, 32 S.E.2d 5, 10 (1944) (per curiam).

I have found no South Carolina appellate decision discussing a criminal defendant's motion to reopen the record to allow that defendant's testimony.  In most of our state's appellate decisions in criminal cases examining a motion to reopen the record, the State, not a defendant, made the motion.  In one such appeal, our supreme court reviewed a trial court's grant of the State's motion to reopen the case to present more evidence.  *See State v. Hammond*, 270 S.C. 347, 355-56, 242 S.E.2d 411, 415 (1978).  In that case, following the defendant's decision to not present evidence, the defendant requested a jury charge allowing the jury to presume a witness who had information about the case and was available to testify but did not, would have testified contrary to the State's position.  *Id.* at 355, 242 S.E.2d at 415.  The trial court indicated the requested charge would be proper but allowed the State to reopen its case and present the witness's testimony over the defendant's objection.  *Id.*  The supreme court affirmed the decision to reopen the case, noting the decision was within the trial court's discretion and finding because the additional testimony merely corroborated the previous testimony and presented no new evidence, the decision did not prejudice the defendant.  *Id.* at 355-56, 242 S.E.2d at 415.

In this case, Petitioner's motion to reopen the case, which Petitioner alleges trial counsel was deficient by not making earlier, was for the purpose of his testifying on his own behalf.  "The right to testify on one's own behalf at a criminal trial is guaranteed by the Fifth, Sixth, and Fourteenth Amendments.  'It is one of the rights that are essential to due process of law in a fair adversary process.'"  *Wright*, 416 S.C. at 372, 785 S.E.2d at 489 (citation omitted) (quoting *Rock v. Arkansas*, 483 U.S. 44, 51 (1987)).  "The right . . . to testify or not to testify is fundamental." *Rivera*, 402 S.C. at 241, 741 S.E.2d at 702.  "However, the right . . . is not without limitation."  *Id.* at 242, 741 S.E.2d at 703.  In some circumstances, "[t]he right may . . . bow to accommodate other legitimate interests in the criminal trial process." *Id.* (quoting *Rock*, 483 U.S. at 55).  "But restrictions of [the] right . . . may not be arbitrary or disproportionate to the purposes they are designed to serve."  *Id.* (quoting *Rock*, 483 U.S. at 55-56).  "In applying its evidentiary rules[,] a [s]tate must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify."  *Id.* (quoting *Rock*, 483 U.S. at 56).  "Evidence rules [that] 'infringe upon a weighty interest of the accused' but fail to serve any legitimate interest are arbitrary."  *Id.* (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)).

In *Rivera*, discussed in depth below, our supreme court looked at several other jurisdictions' decisions concerning a criminal defendant's right to testify. *Id.* at 248-49, 741 S.E.2d at 706-07. One of those cases was *State v. Dauzart*, a direct appeal in which the Louisiana Supreme Court reversed a defendant's conviction, holding the trial court abused its discretion by denying the defendant's motion to reopen the case to allow him to testify in his own defense. 99-3471, p. 2 (La. 10/30/00); 769 So. 2d 1206, 1208 (per curiam). In *Dauzart*, the trial court relied on a statute in the Louisiana Code of Criminal Procedure concerning the order of trial when it denied the motion to reopen. *Id.* The Louisiana Supreme Court noted a trial court has "the discretion under the statute to reopen the evidence at any time before closing arguments to permit the taking of additional testimony." *Id.* The supreme court recognized that "[t]o the extent that an accused's 'right to present his own version of events in his own words' derives in part from the Due Process Clause of the Fourteenth Amendment, . . . a trial court must exercise this discretion in a manner which accords with 'the fundamental standards of due process.'" *Id.* (first quoting *Rock*, 483 U.S. at 51; then quoting *Rock*, 483 U.S. at 55).

In *Dauzart*, the following events preceded the defendant's motion to reopen the case: at the close of the State's case, the defense called a witness to identify medical records. *Id.* at p. 4; 769 So. 2d at 1209. During a recess, defense counsel spoke to the defendant and others about testifying. *Id.* When the jury returned, the defense rested, "subject to introducing the medical records." *Id.* The trial court "ordered the records introduced but then excused the jurors . . . and spent over half an hour with counsel" to streamline the medical records. *Id.* "Toward the end of this process, with the jury still out and with discussion about the court's general charge to the jury also underway, counsel informed the court that [the defendant] 'ha[d] thought about it and decided he wishe[d] to take the witness stand.'" *Id.*

The supreme court reversed the trial court's denial of the defendant's motion to reopen; the supreme court noted the defendant's testimony was essential, the State would not have been prejudiced and had not objected, and the defendant made the request before the matter had progressed past the final witness. *Id.* at p. 5; 769 So. 2d at 1209. The supreme court recognized that while "taking the testimony of any witness out of [the] normal sequence may give the evidence 'distorted importance merely b[y] being introduced after a reopening'" and the State could be prejudiced "if it has already presented rebuttal testimony by providing the defendant with an opportunity to review the evidence before deciding whether to take the stand," neither of those concerns applied there. *Id.* at p. 5; 769 So. 2d at 1209-10 (quoting *United States v. Larson*, 596 F.2d 759, 779 (8th Cir. 1979)). The court noted that

because the jurors had not been allowed to view the defense exhibits when the defense moved to reopen the case, the "jurors would not likely have understood the timing of [the defendant's] testimony as out of turn and therefore extraordinary." *Id.* at p. 5; 769 So. 2d at 1210. Additionally, the State had indicated it had no rebuttal testimony and "even assuming [the defendant's] testimony may have changed" that decision, nothing in the record suggested the State "could not have reassembled its witnesses in rebuttal after the lapse of no more than an hour it took . . . to sort out the" medical documents and "the most important potential rebuttal witness[] remained available." *Id.* The supreme court found "[the defendant's] testimony likely would have had no impact on the course of the proceedings as trial in any event continued into the next day with closing arguments and the court's jury instructions, giving the [S]tate an adequate opportunity to respond to [the defendant's] testimony." *Id.* Additionally, the *Dauzart* court noted trial counsel had told the jury and the trial court that the defendant would testify, thus exposing the defense "to the ridicule of the prosecutors during closing argument," in which the State made several derogatory remarks. *Id.* at p. 6; 769 So. 2d at 1210.

The *Dauzart* court further explained the importance of a defendant's testimony: "Because 'the most important witness for the defense in many criminal cases is the defendant himself,' *Rock* deemed the accused's right to present his or her testimony at trial '[e]ven more fundamental to a personal defense than the right of self-representation' under the Sixth Amendment." *Id.* at p. 6-7; 769 So. 2d at 1210 (alteration in original) (quoting *Rock*, 483 U.S. at 52). The supreme court found the trial court had abused its discretion because it "arbitrarily refus[ed] to allow the defense to reopen its case under circumstances in which the slight deviation from normal practice would have had no impact on the orderly flow of trial from jury selection to verdict and in which strict adherence to the order of trial specified by" the statute cost the defendant "his only opportunity to face jurors and persuade them of his version of events." *Id.* at p. 2; 769 So. 2d at 1208.

As noted above, our supreme court cited to *Dauzart* in *Rivera*. In *Rivera*, the matter of allowing the defendant to testify arose in a different manner than a motion to reopen the record. In that case, the defendant "disagreed with counsel's recommendation not to testify, unambiguously indicated to the trial court that he wished to take the stand, and vociferously objected to the trial court's decision not to permit him to testify." *Rivera*, 402 S.C. at 243, 741 S.E.2d at 703. On direct appeal, our supreme court found "defense counsel actively thwarted [the defendant's] desire to testify. Although, as a practical matter, preventing [the defendant] from testifying may have been an advantageous strategic decision, it

had no basis in the law." *Id.* The supreme court observed, "[T]he trial judge appeared willing to call [the defendant] as a court's witness, but ultimately declined to do so because during the peculiar proffer procedure, [the defendant] indicated his intention to testify about the crime." *Id.* The supreme court found "the trial court, like defense counsel, was operating under the paternalistic belief that it wanted to protect [the defendant] from potentially undermining his own defense." *Id.* The supreme court noted the defendant's "testimony may have been prejudicial to his case but that cannot serve as a basis for the trial court to prevent him from taking the stand." *Id.* The supreme court stated, "The trial court's thorough colloquy with [the defendant] demonstrate[d] the trial court well understood the fundamental nature of the right to testify and that the decision rested solely with [the defendant]." *Id.* "Regardless of whether a defendant's decision to testify is to his own detriment, 'it must be honored out of that respect for the individual which is the lifeblood of the law.'" *Id.* at 245, 741 S.E.2d at 704 (quoting *Dearybury v. State*, 367 S.C. 34, 39, 625 S.E.2d 212, 215 (2006)).[5]

While South Carolina has not done so, some federal and state appeals courts have used a set of factors provided by the Fifth Circuit Court of Appeals to determine whether a trial court has abused its discretion in denying a defendant's motion to reopen the record to exercise his right to testify. *See United States v. Walker*, 772 F.2d 1172 (5th Cir. 1985) (utilizing a set of factors to determine if the trial court abused its discretion in denying a defendant's motion to reopen the evidence to allow his testimony when the defendant made the motion after he rested but before closing arguments or jury instructions were given); *see also United States v. Orozco*, 764 F.3d 997, 1001 (9th Cir. 2014) (using the *Walker* factors "to determine whether a district court abused its discretion in denying a motion to reopen to allow a defendant to testify"); *United States v. Byrd*, 403 F.3d 1278, 1283 (11th Cir. 2005) ("We, like the First Circuit, will consider the factors developed in . . . *Walker* in assessing whether the district court abused its discretion in deciding not to reopen the evidence so that [the defendant] could testify." (citation omitted)); *United States v. Peterson*, 233 F.3d 101, 106-07 (1st

---

[5] In *Rivera*, after determining the trial court's decision to not allow the defendant's testimony violated the United States Constitution, our supreme court considered whether the error required reversal. 402 S.C. at 245, 741 S.E.2d at 705. The supreme court ultimately found the denial of a defendant's right to testify was a structural error, meaning a harmless-error analysis could not apply because prejudice would be presumed. *Id.* at 249-50, 741 S.E.2d at 707. The next section of this dissent will look at that holding as it applies to the prejudice prong of *Strickland*.

Cir. 2000) (applying the *Walker* factors to the district court's decision not to reopen the evidence to allow the defendant to testify); *People v. Martin*, 2014 COA 112, ¶ 37, 338 P.3d 1106, 1116 ("We are persuaded that [the *Walker*] factors articulate part of an appropriate test for Colorado trial courts to employ when exercising their discretion to determine whether to allow revocation of the waiver and reopening of the evidence for a defendant to testify."); *Bloomquist v. State*, 832 P.2d 177, 180 (Alaska Ct. App. 1992) ("Where the defendant moves to reopen his case to testify on his own behalf, we believe that the standards which the Fifth Circuit set out in . . . *Walker* are appropriate for resolving this issue."). Our supreme court cited to *Walker* in *Rivera*. 402 S.C. at 249, 741 S.E.2d at 706.

The Eleventh Circuit Court of Appeals summarized the *Walker* factors as "(1) the timeliness of the motion to reopen, (2) the character of the testimony to be offered, (3) the effect of granting the motion to reopen, and (4) the reasonableness of the excuse for the request to reopen." *Byrd*, 403 F.3d at 1284. Additionally, the Eleventh Circuit noted, "These factors were not chosen specifically because the case dealt with the failure to reopen the evidence in order to allow a defendant to testify; instead, these were the factors used by the Fifth Circuit to evaluate all challenges to a district court's refusal to reopen the evidence." *Id.*

Other circuits and jurisdictions have looked at similar factors emphasizing the importance of whether the nonmoving party would be prejudiced by the grant of the motion to reopen. *See United States v. Trant*, 924 F.3d 83, 88 (3d Cir. 2019) ("When considering a party's motion to reopen its case at trial, 'the district court's primary focus should be on whether the party opposing reopening would be prejudiced if reopening is permitted.'" (quoting *United States v. Coward*, 296 F.3d 176, 181 (3d Cir. 2002))); *id.* ("[T]wo principal considerations for the district court's inquiry are the timing of the moving party's request to reopen (whether, if the motion is granted, the opposing party will have a reasonable opportunity to rebut the moving party's new evidence) and 'the effect of the granting of the motion' (whether granting the motion will cause substantial disruption to the proceedings or result in the new evidence taking on 'distorted importance')." (quoting *Coward*, 296 F.3d at 181)); *id.* ("[D]istrict courts should assess the reasonableness of the moving party's explanation for failing to introduce the desired evidence before resting and whether the new evidence is admissible and has probative value."); *id.* at 89 ("In adopting this standard, we join eight other circuits that have issued essentially the same guidance on how district courts should approach deciding motions to reopen at trial."); *United States v. Nunez*, 432 F.3d 573, 579 (4th Cir. 2005) (instructing a district court to consider the following factors in deciding whether to reopen a case to admit additional evidence: "the

timeliness of the motion, the character of the testimony, and the effect of granting the motion" (quoting *United States v. Peay*, 972 F.2d 71, 73 (4th Cir. 1992))); *id.* ("The party moving to reopen should provide a reasonable explanation for failure to present the evidence in its case-in-chief. The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused. The belated receipt of such testimony should not imbue the evidence with distorted importance, prejudice the opposing party's case, *or preclude an adversary from having an adequate opportunity to meet the additional evidence offered.*" (quoting *Peay*, 972 F.2d at 73)); *United States v. Abbas*, 74 F.3d 506, 510-11 (4th Cir. 1996) (providing that appellate courts, in determining whether a trial court abused its discretion in deciding not reopen a case, "examine (1) whether the party moving to reopen provided a reasonable explanation for failing to present the evidence in its case-in-chief; (2) whether the evidence was relevant, admissible, or helpful to the jury; and (3) whether reopening the case would have infused the evidence with distorted importance, prejudiced the opposing party's case, or precluded the opposing party from meeting the evidence").

In *Byrd*, the Eleventh Circuit summarized the *Walker* court's findings for each factor. 403 F.3d at 1284-85. The court provided, "With respect to the first factor, the Fifth Circuit concluded that [the defendant's] motion to reopen was made in a reasonably timely fashion [because] it had been made on the first day the proceedings reconvened after the evidence had closed." *Id.* at 1284 (citing *Walker*, 772 F.2d at 1177-78). "As to the second factor, the [c]ourt presumed the character of the testimony that would have been offered to be of 'prime importance' because it was the testimony of the defendant himself." *Id.* (quoting *Walker*, 772 F.2d at 1179). "Examining the third factor, the [c]ourt concluded that there was 'no indication' that reopening the evidence would have prejudiced the government; however, there was reason to believe that the defendant had been prejudiced by the failure to reopen." *Id.* at 1284-85 (quoting *Walker*, 772 F.2d at 1179).

The *Byrd* court looked at the *Walker* court's explanation of the four possible ways the government could have been—but was not—prejudiced by the granting of the defendant's motion to reopen the record in *Walker*. *Id.* at 1285 (citing *Walker*, 772 F.2d at 1180-81). First, no interruption of the "orderly flow" of the proceedings occurred, as neither closing arguments nor the jury instruction had been given. *Id.* (quoting *Walker*, 772 F.2d at 1180). Second, none "of the government's witnesses had been released or had otherwise become unavailable." *Id.* (citing *Walker*, 772 F.2d at 1180). Third and fourth, "the testimony of the government's rebuttal witnesses": "the [*Walker*] [c]ourt theorized that" a defendant "having heard the

testimony of the rebuttal witnesses . . . might have been able to 'work his testimony around theirs,' explaining any discrepancies between the rebuttal witnesses' testimony and the defense's case."  *Id.* (quoting *Walker*, 772 F.2d at 1180).  The *Walker* court "also reasoned that, because the defendant had learned what the rebuttal witnesses did not know, he could have 'decide[d] as a strategic matter that it would be safe . . . to testify to certain matters.'"  *Id.* (alteration and omission in original) (quoting *Walker*, 772 F.2d at 1180).  However, "[o]n rebuttal, the government had presented 'two comparatively insignificant witnesses'" and the testimonies could not have "'affected [the defendant's] decision to testify or revealed significant information that would aid him in formulating his own testimony.'"  *Id.* (quoting *Walker*, 772 F.2d at 1181).  The Fifth Circuit determined the defendant, unlike the government, had been prejudiced by not being allowed to reopen the record.  *Id.* (citing *Walker*, 772 F.2d at 1183).  The court found the defendant's attorney had told the jury he would testify, which could "have made a negative impression on the jury" when he ultimately did not, thus prejudicing him. *Id.* (citing *Walker*, 772 F.2d at 1183).

For the last factor, the *Walker* court "concluded that the reasonableness of [the defendant's] excuse for requesting to reopen 'mildly favor[ed] [the defendant's] position, or at least [did] not point in the other direction.'"  *Id.* (second and fourth alterations in original) (quoting *Walker*, 772 F.2d at 1183).  The defendant's explanation of why he chose not to testify was that he had a "'nervous condition'" and he "had been 'emotionally unable' to testify on the day the evidence closed." *Id.* (quoting *Walker*, 772 F.2d at 1184).

The Eleventh Circuit also looked at how the First Circuit had applied the *Walker* factors in *Peterson*, 233 F.3d 101.  *Byrd*, 403 F.3d at 1286-87.  First, as to timeliness, although recognizing defense counsel moved to reopen approximately half an hour after the defense had rested, "the First Circuit still concluded that 'the potential for disruption . . . was not insignificant,' noting that the jury was expecting to hear closing arguments—not further testimony."  *Id.* at 1286 (omission in original) (quoting *Peterson*, 233 F.3d at 107).  Second, for "the character of the testimony to be offered," the First Circuit found it weighed against the defendant because although "the testimony of a criminal defendant is presumed to be inherently significant" in that case, the defendant's counsel provided "that ethical concerns would prevent him from" conducting an examination, leading the First Circuit to conclude the "testimony would not have been particularly valuable."  *Id.* (citing *Peterson*, 233 F.3d at 107).  Third, as to "the effect of granting the motion," the First Circuit briefly stated "the jury would have been confused by the timing of [the defendant's] testimony and the fact that he was not

questioned by defense counsel." *Id.* (citing *Peterson*, 233 F.3d at 107). Fourth, as to the reasonableness of the defendant's excuse, the First Circuit found that "weighed strongly against" the defendant because he gave no excuse at all. *Id.* at 1287 (citing *Peterson*, 233 F.3d at 107).

The Eleventh Circuit, applying the *Walker* factors to its case, found the trial court had not abused its discretion in denying the defendant's request to reopen the record. *Id.* It found the first two factors favored the defendant because he made the motion "the day after the evidence had closed and before both closing arguments and the jury instructions. And, because it was the defendant himself who would have testified, we must consider the character of the testimony to have been of 'inherent significance.'" *Id.* (quoting *Walker*, 772 F.2d at 1179). However, the Eleventh Circuit found the next two factors established the district court had not abused its discretion because reopening "could have prejudiced the prosecution because [the] request came after the government's witnesses had been released." *Id.* Also, the Eleventh Circuit noted because the government's rebuttal witnesses had already testified, the defendant could have "'work[ed] his testimony around theirs,' changing his story in order to avoid discrepancies between the rebuttal witnesses' testimony and the defense's case." *Id.* (quoting *Walker*, 772 F.2d at 1180). The Eleventh Circuit found "[t]he potential prejudice to the government had the evidence been reopened weigh[ed] strongly against [the defendant's] position." *Id.* For the final factor, the court noted the defendant offered "no reasonable explanation for his newly found desire to testify. He merely changed his mind." *Id.* The Eleventh Circuit expressed that it could not "foresee how a district court could abuse its discretion by refusing to reopen the evidence to allow a defendant to testify where the defendant has given no valid reason for not testifying at the proper time." *Id.* at 1288. Accordingly, the Eleventh Circuit affirmed the district court's denial of the defendant's request to reopen the evidence. *Id.*

One district of the Appellate Court of Illinois has also noted when considering an appeal from the denial of a motion to reopen the record to allow a criminal defendant to testify, "Though it is within the discretion of the trial court to determine the question of whether to grant a defendant's motion to reopen . . . , a trial court should not exclude defense testimony except in the most extreme circumstances." *People v. Johnson*, 504 N.E.2d 178, 181 (Ill. App. Ct. 1987). The Appellate Court of Illinois explained, "It is a fundamental constitutional right for a defendant to testify in his own defense. Society's interest in the efficient administration of justice has to be balanced with a defendant's constitutional right to a fair opportunity to defend." *Id.* (citations omitted).

Other decisions in which a state appellate court has reversed the trial court's denial of defendant's motion to reopen the record have made similar determinations. In *Ephraim v. State*, prior to the presentation of the defendant's case, he indicated he did not wish to testify. 627 So. 2d 1102, 1103 (Ala. Crim. App. 1993). At a charge conference, the trial court was notified the defendant had changed his mind and wanted to testify. *Id.* The defendant "told the court that he wanted to tell his side of the story." *Id.* Closing arguments "had not been made and nothing had occurred in the presence of the jury after the defense rested its case." *Id.* The trial court refused to allow the defendant to testify. *Id.* On appeal from that refusal, the appellate court recognized the trial court had discretion whether to allow the testimony but found "the exercise of that discretion result[ed] in the denial of a basic constitutional right," meaning that discretion had been abused. *Id.* at 1105. The court noted that when closing arguments have "been made before [a] defendant reassert[s] his right to testify, a court's reluctance to reopen the case would perhaps be more excusable" but found that in the case before it, "[n]o closing arguments had been made and the only action that had been taken was a charge conference, which occurred off the record and outside the presence of the jury." *Id.*

In the case of *Mayfield v. State*, a Maryland appellate court reversed the trial court's refusal to permit a defendant to reopen his case to testify on his own behalf the morning after the defense had rested. 468 A.2d 400, 402, 409 (Md. Ct. Spec. App. 1983). The court noted the "defendant assert[ed] his right to testify after both sides had rested." *Id.* at 409. The court found the defendant "was a willing, available witness with testimony relevant to the central issue of his guilt or innocence." *Id.* at 409-10. The court determined the defendant was able to "justifiably explain his delay in asserting his desire to testify." *Id.* at 410. The court recognized, "There may be cases where . . . the assertion of the right to testify is merely an attempt at some subterfuge." *Id.* Additionally, the court noted "situations may arise where, although the recantation is sincere, the length of delay causes undue prejudice to the State or disruption to the orderly process of the trial." *Id.* In those cases, the court noted, the trial "court must consider the effects on both the defendant and the State to the end that justice may be served." *Id.* However, in the case before it, the appellate court determined "justice would have been served by permitting the [defendant] to reopen his case." *Id.* Accordingly, the appellate court found "the trial court [had] abused its discretion in failing to permit [the defendant] to reopen his case." *Id.* at 403.

In *People v. Burke*, defense counsel had advised a defendant not to take the stand. 574 N.Y.S.2d 859, 860 (N.Y. App. Div. 1991). The defendant vacillated with the decision but acquiesced with his counsel's recommendation to not testify. *Id.* However, "[a]fter the defense rested and during the charge conference, [the] defendant . . . sought to testify [and] counsel moved to reopen for that purpose." *Id.* The appellate court reversed the trial court's denial of the defendant's motion to reopen to allow his testimony. *Id.* The appellate court noted, "The circumstances here are distinguishable from . . . whe[n] the refusal to reopen the defense to permit the defendant to testify occur[s] after summations ha[ve] been completed." *Id.*

Initially, I note that *Rivera*, in which our supreme court determined depriving a defendant of his right to testify was a structural error, differs from the present case not just because it was a direct appeal but also because the trial court denied the defendant his right to testify based on the court's erroneous application of an evidentiary rule. 402 S.C. at 246, 741 S.E.2d at 705. This case involves the additional consideration of needing to reopen the record to allow a defendant to testify after the defense has rested. Despite the differences in procedure and timing, the principles expressed by our supreme court in *Rivera* are still very much on point.

In this case, trial counsel was deficient by not moving to reopen the record to allow Petitioner to testify at the start of the morning's proceedings. Instead trial counsel waited until Petitioner brought the matter up himself, which was after the trial court made its final ruling it would not charge the jury on self-defense and voluntary manslaughter. If trial counsel had moved to reopen the record at the first opportunity after Petitioner informed Brown he wished to testify—before the charge conference resumed—the trial court would have made its decision based on what had transpired at that time.[6] However, trial counsel did not move to reopen until after the trial court had made its ruling on the jury charges, and the trial court's decision to deny the motion was based on the facts then—namely that Petitioner could craft his testimony to fill in the gaps as pointed out by the court in ruling on the charges.[7] If trial counsel had made a motion to reopen at the start of

---

[6] In Petitioner's direct appeal, this court based its decision on the trial court's having made a final ruling before Petitioner moved to reopen the record. *See Wright*, 416 S.C. at 374, 785 S.E.2d at 490.

[7] Trial counsel had a vast amount of experience between the two attorneys. Martin acknowledged in his PCR testimony they already recognized what needed to be shown for self-defense and voluntary manslaughter charges before the trial court stated it during the jury charge conference. The discussion between the trial court,

the morning's hearing, that motion could have been decided before the trial court made its final ruling. Thus, the trial court's reliance on the fact that it had already ruled would not have been a factor, although the court may have still considered that it had expressed some thoughts on the jury charges the previous day. The trial court's statements in denying the motion to reopen indicates the trial court may have viewed the circumstances differently if the motion had been made prior to its ruling on the jury charges. South Carolina courts have often found no abuse of discretion when the trial court allowed a party, normally the State, to reopen the record to present additional witnesses or admit evidence. *See, e.g.*, *State v. Humphery*, 276 S.C. 42, 43, 274 S.E.2d 918, 918 (1981) ("The trial court did not abuse its discretion in allowing the State to reopen and prove . . . an essential element . . . ."); *State v. Harrison*, 236 S.C. 246, 251, 113 S.E.2d 783, 785 (1960) (finding the trial court had not abused its discretion when after the close of the testimony, the court permitted the State to reopen the case and prove an essential fact to be established, which the court when it ruled on the motion for a directed verdict indicated had been omitted and the court informed the defendants they would be permitted to offer further testimony if they wished, which they declined); *Wren*, 322 S.C. at 106, 470 S.E.2d at 113 ("[T]he trial court did not abuse its discretion in admitting . . . [additional] evidence after the State rested."); *see also id.* at 105, 470 S.E.2d at 112 ("Simplistic as it may seem, the imbroglio posited within this singular trial issue[, the State moving to reopen the evidentiary record after it has rested,] is an oft-occurring event."). *But cf. Bessinger v. Bi-Lo, Inc.*, 329 S.C. 617, 620-21, 496 S.E.2d 33, 35 (Ct. App. 1998) (affirming a circuit court's refusal to reopen a summary judgment hearing to allow the plaintiffs to proffer depositions and evidence because "[t]he decision to reopen the record to allow additional evidence is a matter within the sound discretion of the trial judge").

As described above, other jurisdictions have provided scenarios in which a defendant could expect to be successful in moving to reopen the record. In applying *Walker* factors to the present case, not much time had passed between when Petitioner rested and when he informed counsel he wished to testify—about thirty minutes of a charge conference transpired before proceedings ended for the day. Thus, the first factor weighs in favor of reopening the record. *See Martin*, 2014 COA 112, ¶ 41, 338 P.3d at 1117 ("[W]hen considering the *Walker* factors, these courts still appear to agree that a slight delay weighs in favor of granting the motion."); *Byrd*, 403 F.3d at 1287 (finding a defendant's motion to reopen the

---

trial counsel, and the State prior to the court's ruling did not give Petitioner a substantial advantage.

evidence that is made the day after the evidence has closed and before closing arguments and jury instructions favors granting the motion); *Peterson*, 233 F.3d at 106 (finding the half hour between when the defendant rested and made the motion to reopen during which a "very simple charging conference" took place was a small delay posing "a relatively small threat" of disruption or prejudice). Also, the trial court and parties were still in the middle of the charge conference—closing arguments had not been made, no jury charges had been given, and the jury had not started its deliberations. *See Martin*, 2014 COA 112, ¶ 42, 338 P.3d at 1117 ("[W]hen analyzing the timeliness factor, courts should consider whether a jury instruction conference has taken place and whether the defendant was present for any such conference. A defendant's awareness of the instructions to be given to the jury, or the evidence necessary to obtain a particular instruction, may affect whether the defendant should be allowed to testify after hearing the colloquy between counsel and the trial court."); *Burke*, 574 N.Y.S.2d at 860 ("The circumstances here are distinguishable from . . . [a] refusal to reopen the defense to permit the defendant to testify occur[ring] after summations ha[ve] been completed."); *Dauzart*, 99-3471, p. 5; 769 So. 2d at 1210 (explaining because "jurors had not yet had the opportunity to view the defense documentary exhibits when counsel 'rested' and then moved to 'reopen' its case," "the defense case was still underway and jurors would not likely have understood the timing of [the defendant's] testimony as out of turn and therefore extraordinary").

As to the second factor, the character of the testimony to be offered, as the defendant, Petitioner's testimony would be of great importance. *See Walker*, 772 F.2d at 1179 ("Where the very point of a trial is to determine whether an individual was involved in criminal activity, the testimony of the individual himself must be considered of prime importance."). Trial counsel never stated they believed Petitioner planned to lie to the stand, which would prevented them from conducting an examination. *Cf. Byrd*, 403 F.3d at 1286 (noting although a criminal defendant's testimony "is presumed to be inherently significant," the First Circuit had found the second *Walker* factor weighed against a defendant when counsel expressed he could not conduct an examination of the defendant due to ethical concerns, concluding the "testimony would not have been particularly valuable").

As to the third factor, the effect of granting the motion, the State did not indicate it had any rebuttal witnesses that it had released. *See Dauzart*, 99-3471, p. 5; 769 So. 2d at 1210 (noting because the State had indicated it had no rebuttal testimony and "even assuming [the defendant's] testimony may have changed" that decision, nothing in the record suggested the State "could not have reassembled its witnesses in rebuttal after the lapse of no more than an hour it took . . . to sort out the"

medical documents and "the most important potential rebuttal witness[] remained available"). Additionally, although the trial court later expressed it believed Petitioner would have been able to craft his testify to fill in the holes in his self-defense case the trial court had noted when denying the charge request, trial counsel could have undertaken the same analysis: it was not a revelation. Also, at the time when Petitioner told trial counsel he wanted to testify, the trial court had not made any ruling on that matter. *See id.* (finding the defendant's "testimony likely would have had no impact on the course of the proceedings as trial in any event continued into the next day with closing arguments and the court's jury instructions, giving the [S]tate an adequate opportunity to respond to [the defendant's] testimony")

Finally, Petitioner provided a reason for expressing his desire to testify late: he thought he could change his decision about testify because at the time the trial court asked him if he wished to testify, the trial court had stated he was not bound by the decision. *Cf. Byrd*, 403 F.3d at 1288 (stating it did not "foresee how a district court could abuse its discretion by refusing to reopen the evidence to allow a defendant to testify where the defendant has given no valid reason for not testifying at the proper time").

Therefore, trial counsel acted unreasonably by not moving to reopen the record to allow Petitioner to testify in his own defense, when the trial court had not made a final ruling on the jury charges; counsel had an obligation to test the trial court's discretion. *See Strickland*, 466 U.S. at 688 ("In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."); *id.* at 690 ("The court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."); *Ard*, 372 S.C. at 331, 642 S.E.2d at 597 ("When evaluating the reasonableness of counsel's conduct, 'the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.'" (quoting *Strickland*, 466 U.S. at 690)); *cf. Stone*, 419 S.C. at 386, 798 S.E.2d at 570 ("Without an objection, . . . there can be no debate[,] and the trial court has no opportunity to exercise its discretion."); *id.* ("If [trial counsel] had objected . . . , the trial court may have sustained the objection. But . . . counsel would have at least tested the trial court's discretion."); *id.* ("The fact the trial court has such wide discretion does not justify the decision not to object. Rather, the debate that precedes the exercise of that discretion is part of the adversarial process *Ard* and *Strickland* require trial counsel to test."). In light of the fundamental importance of a criminal defendant's right to testify in his

own defense as pronounced by our supreme court in *Rivera*, viewing the particular facts in this case, trial counsel was deficient in failing to move to reopen the record at the start of the morning's proceedings. *See Rivera*, 402 S.C. at 245, 741 S.E.2d at 704 ("[A] defendant's decision to testify . . . 'must be honored out of that respect for the individual which is the lifeblood of the law.'" (quoting *Dearybury*, 367 S.C. at 39, 625 S.E.2d at 215)); *id.* at 242, 741 S.E.2d at 703 ("In applying its evidentiary rules[,] a [s]tate must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." (quoting *Rock*, 483 U.S. at 56)); *id.* ("Evidence rules [that] 'infringe upon a weighty interest of the accused' but fail to serve any legitimate interest are arbitrary." (quoting *Holmes*, 547 U.S. at 324)); *Wright*, 416 S.C. at 372, 785 S.E.2d at 489 ("The right [to testify] may . . . bow to accommodate other legitimate interests in the criminal trial process. But restrictions of [the] right . . . may not be arbitrary or disproportionate to the purposes they are designed to serve." (quoting *Rivera*, 402 S.C. at 242, 741 S.E.2d at 703)). Accordingly, the PCR court erred in not finding trial counsel deficient.

## II. Prejudice

The analysis cannot end with deciding trial counsel was deficient by preventing Petitioner from asserting his right to testify in his own defense. *See Strickland*, 466 U.S. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Brown*, 340 S.C. at 593, 533 S.E.2d at 309 ("In order to prove prejudice, an applicant must show that but for counsel's errors, there is a reasonable probability the result of the trial would have been different."). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[N]o prejudice occurs, despite trial counsel's deficient performance, where there is otherwise overwhelming evidence of the defendant's guilt." *Smith v. State*, 386 S.C. 562, 566, 689 S.E.2d 629, 631 (2010).

*Rivera* was a direct appeal, while the case before us arises out of PCR. In *Rivera*, the supreme court stated "the narrow issue before the [c]ourt is this: Does the erroneous application of evidentiary rules which results in the wholesale exclusion of a defendant's testimony constitute a structural error not subject to harmless-error analysis?" *Rivera*, 402 S.C. at 246, 741 S.E.2d at 705. The supreme court disagreed with the State's contention "that the denial of a defendant's right to testify

does not in all cases render a criminal trial fundamentally unfair or call into question the reliability of the trial as a vehicle for determining guilt or innocence" and that "such an error is appropriately characterized as a 'trial error' which is subject to the harmless-error doctrine." *Id.* The supreme court recognized, "Most trial errors, even those which violate a defendant's constitutional rights, are subject to harmless-error analysis." *Id.*

However, the supreme court qualified that statement, explaining "despite the strong interests upon which the harmless-error doctrine is based, there are certain constitutional rights which are 'so basic to a fair trial that their infraction can never be treated as harmless error.'" *Id.* at 246-47, 741 S.E.2d at 705 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991)). The supreme court stated, "'These are structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards' and which 'affect [ ] the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" *Id.* at 247, 741 S.E.2d at 705 (alteration in original) (quoting *Fulminante*, 499 U.S. at 309-10). "Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Id.* (quoting *Fulminante*, 499 U.S. at 310). "Essentially, an error is structural if it is 'the type of error which transcends the criminal process.'" *Id.* (quoting *Fulminante*, 499 U.S. at 311).

Our supreme court explained, "The [United States] Supreme Court has found 'an error to be "structural," and thus subject to automatic reversal only in a very limited class of cases.'" *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 8 (1999)). Our supreme court noted, "The Supreme Court has not directly addressed whether a trial court's improper refusal to permit a defendant to testify in his own defense is a structural error or one which is subject to harmless-error analysis." *Id.* at 247, 741 S.E.2d at 706. However, our supreme court determined such an "error is not amenable to harmless-error analysis and requires reversal without a particularized prejudice inquiry." *Id.*

Ultimately, the *Rivera* court held "the right of an accused to testify in his defense is fundamental to the trial process and transcends a mere evidentiary ruling. An accused's right to testify 'is either respected or denied; its deprivation cannot be harmless.'" *Id.* at 249, 741 S.E.2d at 707 (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)). "As such, the error is structural in that it is 'so basic to a fair trial that [its] infraction can never be treated as harmless error.'" *Id.* at 249-50, 741 S.E.2d at 707 (alteration in original) (footnote omitted) (quoting *Fulminante*, 499 U.S. at 289).

The United States Supreme Court has considered how the concepts of a structural error and ineffective assistance of counsel are both applied in a postconviction proceeding. The Supreme Court in *Weaver* specified it needed to discuss and properly apply "two doctrines [in that case]: structural error and ineffective assistance of counsel. The two doctrines are intertwined; for the reasons an error is deemed structural may influence the proper standard used to evaluate an ineffective-assistance claim premised on the failure to object to that error." 582 U.S. at 294.

The *Weaver* Court provided "a constitutional error does not automatically require reversal of a conviction." *Id.* (quoting *Fulminante*, 499 U.S. at 306). "If the government can show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained,' . . . then the error is deemed harmless and the defendant is not entitled to reversal." *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). However, the Court cautioned "some errors should not be deemed harmless beyond a reasonable doubt. These errors . . . [are] known as structural errors." *Id.* (citation omitted). The Court explained, "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." *Id.* at 294-95. "Thus, the defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" *Id*. at 295 (alteration in original) (quoting *Fulminante*, 499 U.S. at 310). "For the same reason, a structural error 'def[ies] analysis by harmless error standards." *Id.* (alteration in original) (quoting *Fulminante*, 499 U.S. at 309).

The Court further specified, "The precise reason why a particular error is not amenable to that kind of analysis—and thus the precise reason why the Court has deemed it structural—varies in a significant way from error to error. There appear to be at least three broad rationales." *Id.*

The Court indicated the first type of structural error occurs when "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Id.* "This is true of the defendant's right to conduct his own defense, which, when exercised, 'usually increases the likelihood of a trial outcome unfavorable to the defendant.'" *Id.* (quoting *McKaskle*, 465 U.S. at 177 n.8). "That right is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Id.* "Because harm is irrelevant to the basis underlying the right, the Court has deemed a violation of that right structural error." *Id.*

Next, the Court described the second type of structural error, which arises when "the effects of the error are simply too hard to measure. For example, when a defendant is denied the right to select his or her own attorney, the precise 'effect of the violation cannot be ascertained.'" *Id.* (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006)). "Because the government will, as a result, find it almost impossible to show that the error was 'harmless beyond a reasonable doubt,' the efficiency costs of letting the government try to make the showing are unjustified." *Id.* at 295-96 (quoting *Chapman*, 386 U.S. at 24).

The Court provided the third type of structural error happens when "the error always results in fundamental unfairness. For example, if an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction, the resulting trial is always a fundamentally unfair one. It therefore would be futile for the government to try to show harmlessness." *Id.* at 296 (citations omitted). However, the Court noted, "These categories are not rigid. In a particular case, more than one of these rationales may be part of the explanation for why an error is deemed to be structural." *Id.* "For these purposes, however, one point is critical: An error can count as structural even if the error does not lead to fundamental unfairness in every case." *Id.* "[T]he term 'structural error' carries with it no talismanic significance as a doctrinal matter." *Id.* at 299. "It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.'" *Id.* (quoting *Chapman*, 386 U.S. at 24). "Thus, in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Id.* (quoting *Neder*, 527 U.S. at 7).

The Court then addressed what happens when a structural error is not preserved for direct appeal and instead is raised in a postconviction proceeding: "The question . . . becomes what showing is necessary when the defendant does not preserve a structural error on direct review but raises it later in the context of an ineffective-assistance-of-counsel claim." *Id.* "To obtain relief on the basis of ineffective assistance of counsel, the defendant as a general rule bears the burden to meet two standards." *Id.* "First, the defendant must show deficient performance—that the attorney's error was 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Second, the defendant must show that the attorney's error 'prejudiced the defense.'" *Id.* at 299-300 (quoting *Strickland*, 466 U.S. at 687).

"The prejudice showing is in most cases a necessary part of a *Strickland* claim. The reason is that a defendant has a right to effective representation, not a right to an attorney who performs his duties 'mistake-free.'" *Id.* at 300 (quoting *Gonzalez-Lopez*, 548 U.S. at 147). "As a rule, therefore, a 'violation of the Sixth Amendment right to effective representation is not 'complete' until the defendant is prejudiced.'" *Id.* (quoting *Gonzalez-Lopez*, 548 U.S. at 147). "That said, the concept of prejudice is defined in different ways depending on the context in which it appears. In the ordinary *Strickland* case, prejudice means 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "But the *Strickland* Court cautioned that the prejudice inquiry is not meant to be applied in a 'mechanical' fashion. For when a court is evaluating an ineffective-assistance claim, the ultimate inquiry must concentrate on 'the fundamental fairness of the proceeding.'" *Id*. (quoting *Strickland*, 466 U.S. at 696).

In *Weaver*, the petitioner argued "that under a proper interpretation of *Strickland*, even if there is no showing of a reasonable probability of a different outcome, relief still must be granted if the convicted person shows that attorney errors rendered the trial fundamentally unfair." *Id.* However, the Court determined that based on its ultimate holding in that case, it did not need to decide if that argument was correct. *Id. Weaver* involved an allegation of ineffective assistance of counsel for the failure to object to a public-trial violation. *Id.* at 292-93. The *Weaver* Court explained that "not every public-trial violation will in fact lead to a fundamentally unfair trial" and "the failure to object to a public-trial violation [does not] always deprive[] the defendant of a reasonable probability of a different outcome." *Id.* at 300. Accordingly, the Court held that "when a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, *Strickland* prejudice is not shown automatically." *Id.* at 300-01. Instead, the Court explained that in that situation, "the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or, as the Court has assumed for these purposes, to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Id.* at 301 (citation omitted).

The Court clarified nothing in its reasoning or holding called into question its "precedents determining that certain errors are deemed structural and require reversal because they cause fundamental unfairness, either to the defendant in the specific case or by pervasive undermining of the systemic requirements of a fair and open judicial process." *Id.* The Court provided examples of those decisions, such as the failure to give a reasonable-doubt instruction, a proceeding with a biased judge, and the exclusion of grand jurors on the basis of race. *Id.*

Additionally, it noted it had granted automatic relief to defendants who prevailed on claims alleging race or gender discrimination in the selection of the petit jury, even though it had not yet explicitly labeled those errors structural. *Id.* The Court stated, "The errors in those cases necessitated automatic reversal after they were preserved and then raised on direct appeal. *And this opinion does not address whether the result should be any different if the errors were raised instead in an ineffective-assistance claim on collateral review.*" *Id.* at 301-02 (emphasis added).

The *Weaver* Court then explained why, in a public-trial violation case, whether the violation is preserved and raised on direct appeal or raised in a post-conviction proceeding alleging ineffective assistance of counsel dictates whether or not the defendant is required to show prejudice. *Id.* at 302. The Court provided that in the direct appeal situation, the trial court had the opportunity to correct the violation. *Id.* Also, the amount of time and costs before a direct appeal are small when compared to the later postconviction proceeding. *Id.* The Court stated, "When an ineffective-assistance-of-counsel claim is raised in post[-]conviction proceedings, the costs and uncertainties of a new trial are greater because more time will have elapsed in most cases." *Id.* "The finality interest is more at risk, *see Strickland*, 466 U.S. at 693-94 (noting the 'profound importance of finality in criminal proceedings'), and direct review often has given at least one opportunity for an appellate review of trial proceedings." *Id.* at 302-03. "[T]he rules governing ineffective-assistance claims 'must be applied with scrupulous care.'" *Id.* at 303 (quoting *Premo v. Moore*, 562 U.S. 115, 122 (2011)).

At the outset of *Weaver*, the Court provided that "the Federal Courts of Appeals and some state courts of last resort [disagree] about whether a defendant must demonstrate prejudice in" ineffective assistance of counsel claims involving structural errors. *Id.* at 293. The Court stated it had granted certiorari to resolve this disagreement but noted it had done "so specifically and only in the context of trial counsel's failure to object to the closure of the courtroom during jury selection." *Id.* at 294.

Recently, when reviewing the grant of PCR application, this court examined *Weaver* in order to determine if the error in that case was structural. *Carrier v. State*, 441 S.C. 547, 554, 558-60, 895 S.E.2d 679, 683, 685-86 (Ct. App. 2023), *cert. denied*, S.C. Sup. Ct. Order dated Nov. 14, 2024. This court stated, "Prejudice in ineffective-assistance-of-counsel claims is typically analyzed using a harmless error framework. However, a class of errors known as structural defects are not analyzed under the harmless error framework and are sometimes presumed prejudicial." *Id.* at 558, 895 S.E.2d at 685 (citation omitted). "[D]espite the strong

interests upon which the harmless-error doctrine is based, there are certain constitutional rights which are so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* (alteration in original) (quoting *Rivera*, 402 S.C. at 246-47, 741 S.E.2d at 705). "These 'structural defects' only occur when an error affects 'the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" *Id.* (quoting *Fulminante*, 499 U.S. at 310). "Structural defects comprise 'a very limited class of cases.'" *Id.* (quoting *Rivera*, 402 S.C. at 247, 741 S.E.2d at 705). "When a structural error is raised in the context of an ineffective . . . assistance claim, . . . finality concerns are far more pronounced." *Id.* (omissions in original) (quoting *Weaver*, 582 U.S. at 305). This court recognized Justice Alito's concurrence in *Weaver* had described two ways for a criminal defendant to meet "the *Strickland* prejudice requirement[:] [a] defendant must demonstrate either that the error at issue was prejudicial or that it belongs to the narrow class of attorney errors that are tantamount to a denial of counsel, for which an individualized showing of prejudice is unnecessary." *Id.* (quoting *Weaver*, 582 U.S. at 308 (Alito, J., concurring in judgment)).

This court summarized the Supreme Court's guidance in *Weaver* for classifying structural errors,[8] stating: "The Supreme Court has identified a narrow set of scenarios that are structural errors as a matter of law and automatically warrant a presumption of prejudice." *Carrier*, 441 S.C. at 558-59, 895 S.E.2d at 685 (citing *Weaver*, 582 U.S. at 301 (noting three examples of structural errors: biased judges, exclusions of grand jurors based on race, and failures to give reasonable-doubt instructions)). "Beyond this, the Court has identified three '*Weaver*' categories in which structural errors tend to fall: (1) violations of rights designed to protect some interest of the defendant other than his interest against erroneous convictions; (2) errors with unmeasurable effects; and (3) errors that necessarily result in fundamental unfairness." *Id.* at 559, 895 S.E.2d at 685 (citing *Weaver*, 582 U.S. at 295-96).

This court further explained, "The first *Weaver* category encompasses violations of rights designed to protect some interest of the defendant other than his interest against an erroneous conviction." *Carrier*, 441 S.C. at 559, 895 S.E.2d at 685. "The classic example of such a right is the right to testify at one's own criminal

---

[8] "Before *Weaver* . . . , courts often treated structural errors as immune to the need for a prejudice analysis." *Carrier*, 441 S.C. at 558 n.9, 895 S.E.2d at 685 n.9. "However, in *Weaver*, the Court found that violation of the right to a public trial, although structural, 'does not always lead to a fundamentally unfair trial,' meaning the burden of proving prejudice remained." *Id.* (quoting *Weaver*, 582 U.S. at 304).

trial, which when exercised 'usually increases the likelihood of a trial outcome unfavorable to the defendant' and thus is designed to protect an interest *other than* the interest against an erroneous conviction." *Id.* at 559, 895 S.E.2d at 685-86 (quoting *Weaver*, 582 U.S. at 295). "[T]he second category . . . encompasses errors that result in effects too difficult to measure . . . ." *Id.* at 559, 895 S.E.2d at 686. "[T]he third category includes errors that 'always result in fundamental unfairness.'" *Id.* at 560, 895 S.E.2d at 686 (quoting *Weaver*, 582 U.S. at 296).

This court also looked at the *Weaver* decision in a direct appeal, noting "an error is structural if: (1) the right at issue is designed to protect an interest other than the defendant's interest in being wrongly convicted; (2) the effects of the error are 'simply too hard to measure'; or (3) the error always results in fundamental unfairness." *State v. Wright*, 432 S.C. 365, 371, 852 S.E.2d 468, 471-72 (Ct. App. 2020) (quoting *Weaver*, 582 U.S. at 295), *aff'd*, 439 S.C. 101, 886 S.E.2d 206 (2023). This court found the error in that case "b[ore] all three of these traits." *Id.* at 371, 852 S.E.2d at 472.

*Rivera* provides the denial of a defendant's right to testify on his own behalf is a structural error. *Weaver* explains that for a certain type structural error, the normal *Strickland* prejudice examination may not apply. *Weaver*, 582 U.S. at 300. *Weaver* reiterates *Strickland*'s instruction that "the ultimate inquiry must concentrate on 'the fundamental fairness of the proceeding.'" *Weaver*, 582 U.S. at 300 (quoting *Strickland*, 466 U.S. at 696). As *Rivera* was decided before *Weaver*—and because it was a direct appeal—our supreme court did not classify the type of structural error the denial of the right to testify. The error here falls into more than one of the categories of structural errors provided by *Weaver*. *See Weaver*, 582 U.S. at 296 (providing the "categories are not rigid" and "more than one of these rationales may be part of the explanation for why an error is deemed to be structural"). Specifically, I believe, relying on our supreme court's reasoning in *Rivera*, denying a defendant his right to testify on his own behalf falls into the category of structural error that always results in fundamental unfairness. *See Weaver*, 582 U.S. at 296 (providing the third type of structural error happens when "the error always results in fundamental unfairness"); *id.* at 300 ("[T]he *Strickland* Court cautioned that the prejudice inquiry is not meant to be applied in a 'mechanical' fashion. For when a court is evaluating an ineffective-assistance claim, the ultimate inquiry must concentrate on 'the fundamental fairness of the proceeding.'" (quoting *Strickland*, 466 U.S. at 696)); *Rivera*, 402 S.C. at 249, 741 S.E.2d at 707 ("[T]he right of an accused to testify in his defense is fundamental to the trial process . . . ."); *id.* at 249-50, 741 S.E.2d at 707 ("[T]he error . . . is 'so basic to a fair trial that [its] infraction can never be treated as harmless error.'" (last

alteration in original) (quoting *Fulminante*, 499 U.S. at 289)); *id.* at 246, 741 S.E.2d at 705 (disagreeing with the assertion "that the denial of a defendant's right to testify does not in all cases render a criminal trial *fundamentally unfair* or call into question the reliability of the trial as a vehicle for determining guilt or innocence" (emphasis added)); *see also State v. Loher*, 398 P.3d 794, 813 (Haw. 2017) ("A trial court's interference with the defendant's ability to make an informed, unrestricted decision whether to waive a critical constitutional privilege undermines 'that fundamental fairness essential to the very concept of justice.'" (quoting *State v. Grindles*, 777 P.2d 1187, 1190 (Haw. 1989))); *State v. Cantu*, 547 P.3d 477, 482 (Kan. 2024) (stating that the United Stated Supreme "Court has identified the right to testify as . . . essential to a fair trial"); *id.* at 487 ("[W]here the impairment [of a defendant's right to testify] is closer to absolute, it 'implicates the basic consideration of fairness' expected in a criminal trial." (quoting *State v. McDaniel*, 395 P.3d 429, 439 (Kan. 2017))); *id.* ("[A]n analysis of whether the outcome of the trial would have been different if [the defendant] had been allowed to testify is irrelevant because he [wa]s prejudiced by this lack of essential due process which rendered his criminal trial fundamentally unfair."); *State v. Hampton*, 2000-0522, p. 13 (La. 3/22/02); 818 So. 2d 720, 729 ("*Rock* . . . spoke of the right to testify as among those rights that '*are essential to due process of law in a fair adversary process.*' Therefore, such language unmistakably places the defendant's right to testify among those protections without which a criminal trial is 'structurally flawed.'" (quoting *Rock*, 483 U.S. at 51)); *Irwin v. State*, 400 N.W.2d 783, 785 (Minn. Ct. App. 1987) (recognizing that "a criminal defendant['s] . . . right to testify in his own defense" "is a basic right, fundamental to a fair trial").

Accordingly, the traditional method of proving prejudice described in *Strickland*—which requires a PCR applicant to prove but for counsel's error, the result would have been different—is not appropriate here. *See Weaver*, 582 U.S. at 300 ("[T]he concept of prejudice is defined in different ways depending on the context in which it appears. In the ordinary *Strickland* case, prejudice means 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (quoting *Strickland*, 466 U.S. at 694)); *id.* at 308 (Alito, J., concurring in judgment) (explaining a defendant may meet "the *Strickland* prejudice requirement" two ways: by demonstrating either (1) "that the error at issue was prejudicial or [(2)] that it belongs to the narrow class of attorney errors that are tantamount to a denial of counsel, for which an individualized showing of prejudice is unnecessary"); *see also id.* at 300 (majority opinion) ("[W]hen a court is evaluating an ineffective-assistance claim, the ultimate inquiry must concentrate on 'the fundamental fairness of the proceeding.'" (quoting

*Strickland*, 466 U.S. at 696)).  Therefore, because trial counsel was deficient as described previously and the prejudice requirement is met due to the fundamental unfairness in denying a criminal defendant his right to testify, the PCR court erred in denying Petitioner's PCR application.

## III.  Conclusion

The PCR court erred in finding trial counsel was not ineffective.  The PCR court incorrectly determined trial counsel was not deficient for failing to inform the trial court of Petitioner's change in desire to testify at the beginning of the morning proceeding before the trial court ruled on the jury charges.  As expressed in *Rivera*, the defendant's right to testify impacts the fundamental fairness of the proceeding.  Accordingly, the PCR court erred in applying the traditional *Strickland* prejudice requirement.  Therefore, I would reverse the PCR court's decision and send the case to general sessions.